United States District Court
District of Massachusetts

```
_____
                              )
OPERATION ABLE OF GREATER      )
BOSTON, INC.,                  )
          Plaintiff,           )
                               )    Civil Action No.
          v.                   )    09-10947-NMG
                               )
NATIONAL ABLE NETWORK, INC.,   )
          Defendant.           )
_____)
```

MEMORANDUM & ORDER

GORTON, J.

This is an action for trade name and service mark infringement.  The plaintiff has moved for a preliminary injunction to preclude the defendant from using allegedly similar marks within the geographic area in which plaintiff operates.

I.  **Factual Background**

A.  **The Parties**

Plaintiff, Operation ABLE of Greater Boston, Inc. ("Operation ABLE"), is a non-profit organization that assists mature workers seeking to re-enter the job market in the Greater Boston, Massachusetts, region through job training and placement. Operation ABLE was founded in 1982, originally as a part of an organization called Careers For Later Years, and became an independent organization in 1990.

Operation ABLE is one of several non-profit organizations that have historically provided similar career training services

-1-

throughout the country.  In addition to the plaintiff, two other organizations have used the word "able" as part of their name: Operation ABLE of Michigan and the defendant, National Able Network, Inc. ("National Able").

National Able was founded in 1966 and originally operated in Chicago, Illinois, under the name Operation ABLE, Inc.  In 2004, the defendant changed its name from Operation ABLE, Inc. to National Able Network, Inc. and began expanding geographically beyond Chicago.  According to the defendant, it changed its name for two reasons: 1) to reflect the organization's new business direction, namely, serving job seekers through multiple locations nationwide and 2) to avoid confusion with other Operation ABLE entities around the country (including the plaintiff).  Like Operation ABLE, National Able's mission is to provide employment and training opportunities for older workers.

**B.   Use of the ABLE Mark**

In 1983, the defendant (then operating as Operation ABLE, Inc.) filed a trademark application for "Operation ABLE" and obtained a federal registration of that mark in 1985.  That registration was cancelled in 1991.  In 2004, defendant registered the marks "National Able Network," "Able Career Institute" and a logo displaying "Able A!"

The plaintiff, Operation ABLE, asserts that it has been using the service marks "Operation ABLE" and "ABLE" continuously

since 1985, although it has never registered those marks. Operation ABLE uses the ABLE mark as an acronym for "Ability Based on Long Experience" but pronounces the mark like the two syllable word "able."

### C.   The SCSEP Program

The Senior Community Service Employment Program ("SCSEP") is a program administered by the U.S. Department of Labor ("the DOL") which awards grants to non-profit organizations to subsidize employment opportunities for older workers.  Grants are awarded both directly from the DOL to non-profits and to the states, which in turn issue grants to non-profits (i.e., organizations can potentially receive SCSEP funding from one or both sources).

Non-profit organizations, such as both parties in this case, administer the SCSEP program by 1) providing employment skills and 2) placing workers in jobs in the non-profit sector and subsidizing their wages.  Some jobs involve working for the grantee organization itself.  The DOL has promulgated detailed regulations governing the administration of SCSEP and the services to be provided.

### D.   Operation ABLE and National Able's Collaboration

In 2003, National Able and Operation ABLE (along with two other organizations) applied jointly for, and received, a SCSEP grant from the DOL to deliver services in several Massachusetts

-3-

communities (specifically, Norfolk and Middlesex counties).
National Able was designated as the primary grantee but later
entered into a subgrant agreement ("the Subgrant Agreement") with
Operation ABLE whereby the plaintiff was commissioned to
administer the grant for the designated Massachusetts
communities.  In 2006 the DOL renewed National Able's grant for
Essex and Middlesex counties and Operation ABLE again served as
subgrantee.[1]

The original Subgrant Agreement entered into in 2003
provides:

> In the event the SUBGRANTEE makes any public
> announcements, written or oral, publicizes or furnishes
> any materials and/or information and/or concerning
> activities under this Subgrant, such item or activity
> shall include information that the project is funded by
> a Subgrant with [National Able Network, Inc.], with
> funding provided by the United States Department of
> Labor.

Later versions of the agreement included that same language but
added the following:

> Use of the National Able Network, Inc. registered
> trademark and logo will be in accordance with standards
> approved and published by National Able Network, Inc.

In accordance with those requirements, plaintiff sent materials
to participants displaying the names and logos of both Operation

---

[1] Operation ABLE asserts that, in addition to acting as
subgrantee for National Able in Essex and Middlesex counties, it
receives a separate SCSEP grant from the Commonwealth of
Massachusetts and serves as the exclusive state SCSEP
administrator in Essex, Suffolk and Worcester counties, and as
one of two state administrators in Middlesex County.

ABLE <u>and</u> National Able.

In 2008, National Able began renting office space in Massachusetts from Operation ABLE in connection with separate services provided under the DOL's Job Readiness Training ("JRT") program.  That program serves the same participants as the SCSEP program but focuses on job training rather than placement. National Able has been using its name and logo in association with the JRT program operated in Boston.

### E.   Conduct Giving Rise to the Litigation

On April 23, 2009, National Able notified Operation ABLE that it would not be renewing the Subgrant Agreement, which was set to expire on June 30, 2009.  National Able also sent letters to participants and training sites of the SCSEP program stating that, as of July 1, 2009, it would provide services directly rather than through Operation ABLE as a subcontract provider. The letter invited participants to voice any issues or concerns at a "Town Hall Meeting" to be held in the near future.

National Able contends that it declined to renew the Subgrant Agreement for two reasons: 1) to further its goal of providing direct services according to its own policies, procedures and standards for performance and efficiency and 2) because of certain inadequacies in Operation ABLE's performance. Operation ABLE responds that it was told that its performance was not an issue.  It also asserts that the defendant subsequently

-5-

attempted to recruit its professional staff to work at National
Able and that it has posted a job listing seeking staff for its
Massachusetts operations.

### F.  Evidence of Confusion

In an affidavit, Joan Cirillo, Executive Director of
Operation ABLE, asserts that at least 25 SCSEP participants were
confused after receiving the letter from National Able informing
them of the change in provider.  The affidavit further states
that some participants did not understand that National Able and
Operation ABLE were separate organizations and instead believed
that Operation ABLE had simply changed its name.  Moreover, staff
at various training sites were allegedly confused by National
Able's "marketing and solicitation."  The affidavit of Kathy
McDermott, an Operation ABLE employee working in Lowell,
Massachusetts, states that some participants "thought the letter
was from Operation ABLE, and it was just informing them of 'a
name change'."[2]

## II.  Procedural History

Plaintiff filed a complaint, asserting federal and state
claims for trademark infringement and a claim pursuant to the

---

[2] In a third affidavit, Linda Foote, another Operation ABLE
employee, asserts that one participant told her that he "thought
he was [already] working for ABLE."  Foote has since indicated an
intent to retract her affidavit in an apparent effort to remove
herself from involvement with this litigation and thereby gain
employment at National Able.  Accordingly, this Court gives no
weight to her assertions.

Massachusetts Consumer Protection Act, M.G.L. c. 93A ("Chapter
93A"), on June 4, 2009.  On that same day it filed the pending
motion for preliminary injunction along with supporting
affidavits (but with no proposed injunction).

Shortly thereafter, the opposed the motion for preliminary
injunction and answered the complaint.  In its answer, the
defendant asserts counterclaims for breach of contract, trademark
infringement and unfair competition under Chapter 93A.  It also
asserts a number of affirmative defenses, including laches and
acquiescence.  Plaintiff submitted a reply and this Court heard
oral argument on July 29, 2009.

## III. **Motion for Preliminary Injunction**

### A.   **Legal Standard**

To obtain preliminary injunctive relief under Fed. R. Civ.
P. 65, a movant must demonstrate

> (1) a substantial likelihood of success on the merits,
> (2) a significant risk of irreparable harm if the
> injunction is withheld, (3) a favorable balance of
> hardships, and (4) a fit (or lack of friction) between
> the injunction and the public interest.

Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)
(citation omitted).  In trademark cases, likelihood of success on
the merits is of particular consequence because "resolution of
the other three factors will depend in large part on whether the
movant is likely to succeed in establishing infringement."
Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115

-7-

(1st Cir. 2006) (citations omitted).

**B.  Application**

**1.   Likelihood of Success on the Merits**

To succeed on a claim for trademark infringement a plaintiff must show that 1) it has a protectable mark and 2) the defendant's use of that mark is to likely result in consumer confusion.  <u>Id.</u> at 116.  Here, the parties dispute plaintiff's likelihood of success on both prongs.

**a.  Protectable Mark**

Although plaintiff's mark is unregistered, it is entitled to protection if it is distinctive.  <u>See</u> <u>id.</u>  Distinctiveness is a term of art in trademark law and is generally determined by reference to the following spectrum: 1) generic (least distinctive), 2) descriptive, 3) suggestive, 4) arbitrary and 5) fanciful (most distinctive).  <u>Boston Duck Tours, LP</u> v. <u>Super Duck Tours, LLC</u>, 531 F.3d 1, 12 (1st Cir. 2008) (citing <u>Two Pesos, Inc.</u> v. <u>Taco Cabana, Inc.</u>, 505 U.S. 763, 769 (1992)).  Marks that are suggestive (e.g., COPPERTONE), arbitrary (e.g., APPLE computers) or fanciful (e.g., EXXON) are considered inherently distinctive while generic marks are entitled to no protection. <u>See</u> <u>id.</u> at 12-14, 19-21 (finding "Duck Tour" to be generic). Descriptive marks are distinctive, and thus protectable, only if they acquire "secondary meaning" by "becom[ing] associated with a single commercial source."  <u>See</u> <u>id.</u> at 13.

-8-

The marks Operation ABLE and ABLE, as used by an
organization that provides training and placement to mature
workers seeking to reenter the job market, are not generic
because they do not merely designate what Operation ABLE's
services are.  See id. at 14 ("Rather than answering the question
'where do you come from?', a generic term merely explains 'what
are you?'" (citation omitted)).  Whether those marks are merely
descriptive (requiring secondary meaning to be worthy of
protection) or suggestive (and, thus, inherently distinctive) is
a closer question.  The First Circuit Court of Appeals has
explained the distinction between those categories as follows:

> A term is suggestive if it requires imagination,
> thought and perception to reach a conclusion as to the
> nature of [services].  A term is descriptive if it
> forthwith conveys an immediate idea of the ingredients,
> qualities or characteristics of the [services].

Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 544
(1st Cir. 1995) (quoting Blinded Veterans Ass'n v. Blinded Am.
Veterans Found., 872 F.2d 1035, 1040 (D.C. Cir. 1989)).

Here, the marks Operation ABLE and ABLE fit most comfortably
into the category of suggestive marks.  Although the term ABLE
serves a dual purpose, both suggesting the ability of mature
workers and functioning as an acronym for "Ability Based on Long
Experience," the mark makes no direct reference to mature workers
or job training and placement.  With "imagination, thought and
perception" one might connect the mark to the services that

-9-

plaintiff provides, but the mark alone does not immediately convey the quality of those services.  See id. at 544-45 (finding "Equine Technologies" to be suggestive of plaintiff's product, hoof pads for horses).  Plaintiff has therefore demonstrated that it will likely prevail in showing that its marks are distinctive.

The defendant nevertheless asserts that this Court should focus only on the mark Operation ABLE in weighing the likelihood of confusion and not the mark ABLE in isolation.  As grounds it asserts that plaintiff has proffered insufficient evidence that it uses ABLE apart from Operation in a source-identifying manner.

A careful review of the record reveals that, although often referred to as Operation ABLE, plaintiff frequently identifies itself, and is identified by others, as merely ABLE.  For example, annual reports from 1985-1989 and 2008 repeatedly refer to the organization as ABLE.  Several media reports (in the Boston Herald and other outlets) have also used the shorthand ABLE.  Finally, plaintiff's website uses Operation ABLE and ABLE interchangeably.

Furthermore, as explained above, the mark ABLE is suggestive and thus inherently source-identifying.  See Boston Duck Tours, 531 F.3d at 13 ("Marks classified as suggestive . . . are all considered inherently distinctive because they have the capacity to serve a source-identifying function upon first use.").  Accordingly, this Court finds that plaintiff has demonstrated a

likelihood of success with respect to the protectability of both Operation ABLE and ABLE in isolation.[3]

### b.   Acquiescence

Before proceeding to the likelihood of confusion, defendant's laches/acquiescence argument is appropriate for consideration.  The defendant asserts that the plaintiff acquiesced in its use of the disputed marks by entering into, and acting in conformance with, the Subgrant Agreement that required Operation ABLE to include National Able's name and logo in all public announcements concerning its administration of the SCSEP program.  Alternatively, it asserts that the defense of laches applies because of plaintiff's delay in bringing suit.

### i.   Legal Standards

Laches and acquiescence are affirmative defenses and therefore the defendant bears the burden of showing a likelihood of success with respect to both.  Laches applies when a plaintiff's unreasonable delay in filing suit causes prejudice to the defendant.  Oliva v. Ramirez, Civ. No. 07-1569, 2007 WL 2436305, at *2 (D.P.R. Aug. 21, 2007) (citation omitted). Acquiescence is a related doctrine that denotes active, as opposed to passive, consent to use of a mark.  See Coach House

---

[3] Defendant's evidence of other Massachusetts entities which use some variation of the word "Able" in their name is irrelevant because none of those organizations directly competes with plaintiff.  See Equine Techs., 68 F.3d at 547.

Restaurant, Inc. v. Coach & Six Restaurants, Inc., 934 F.2d 1551,
1558 (11th Cir. 1991).  Acquiescence requires a defendant to show
that 1) the plaintiff actively represented that it would not
assert a right or claim, 2) the delay between active
representation and assertion of the right was not excusable and
3) the delay caused the defendant undue prejudice.  See
Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports
Physical Therapy, P.C., 314 F.3d 62, 67 (2d Cir. 2002) (Walker,
C.J.); Coach House Restaurant, 934 F.2d at 1558.

The First Circuit has had little occasion to explore the
contours of the doctrine of acquiescence.  In looking to other
jurisdictions for guidance, this Court finds the analysis of the
Second Circuit Court of Appeals in Profitness Physical Therapy
Center v. Pro-Fit Orthopedic and Sports Physical Therapy, P.C. to
be particularly useful, as have other courts within this circuit.
See 314 F.3d at 68-69; see also Oliva, 2007 WL 2436305, at *2-3
(citing Profitness); Cold Defense LLC v. Bushmaster Firearms,
Inc., No. 04-cv-240, 2005 WL 2293909, at *34 (D. Me. Sept. 20,
2005) (same).

In Profitness, the Second Circuit explained that
"[a]cquiescence does not extend to a use that has not yet
materialized and is not foreseeable," and "a defendant may exceed
the scope of the plaintiff's consent and be exposed to liability
for . . . extra-consensual use."  314 F.3d at 69; see also Oliva,

-12-

2007 WL 2436305, at *3 (noting, with respect to laches, that
defendant's use of the disputed marks should be measured "from
the date that the defendant's acts first significantly impacted
on plaintiff's goodwill and business reputation").  A "critical
circumstance" bearing on the scope of plaintiff's acquiescence is
the likelihood of confusion.  <u>Profitness</u>, 314 F.3d at 69.  That
is, whether a new use increases the likelihood of confusion, thus
suggesting that it exceeds the scope of plaintiff's consent.  <u>See</u>
<u>id.</u> (remanding to district court to determine whether defendant's
expansion into Manhattan from Queens, New York, increased
likelihood of confusion and exceeded scope of plaintiff's
acquiescence).

### ii.  Application

Here, the defendant argues that the plaintiff acquiesced to
its use of the disputed marks by entering into the Subgrant
Agreement and thereafter including the defendant's name and logo
(along with its own) on materials it distributed.  The plaintiff
also rented office space to the defendant for use in connection
with its JRT program.  The defendant uses the same name and logo
in connection with that program.  This Court concludes that those
actions represent at least an implicit acquiescence to
defendant's use of its marks.  <u>See</u> <u>id.</u> at 68 (noting that "a
plaintiff communicates active consent by conduct that amounts to
an explicit or implicit assurance that plaintiff . . . will not

assert its trademark rights").

Defendant has also made an adequate showing of prejudice in that it 1) changed its name to National Able to avoid confusion and 2) has invested in that name in Massachusetts and elsewhere for more than five years.

This Court is not persuaded by the plaintiff's contention that defendant's right to use the marks was conditioned on it remaining "affiliated" with Operation ABLE.  There was no formal affiliation between National Able and Operation ABLE but rather a simple contractual relationship.  Cf. U.S. Jaycees v. Phil. Jaycees, 639 F.2d 134, 136 (3d Cir. 1981) (local chapter of national organization had its charter revoked); Am. ORT, Inc. v. ORT Israel, No. 07-cv-2332, 2007 WL 2049733, at *2 (S.D.N.Y. July, 17, 2007); Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity, 654 F. Supp. 1095, 1097 (D.N.H. 1987).  Nor can the Subgrant Agreement be read as an express or implicit license permitting National Able to use its name and marks only in collaboration with Operation ABLE.  Cf. Jaycees, 639 F.2d at 139 n.7 (finding arrangement to be a license agreement); Kappa Sigma, 654 F. Supp. at 1100 (same).  To the contrary, the only restrictions regarding the use of marks that can be found in the Subgrant Agreement are those imposed by National Able on Operation ABLE.

Accordingly, the defendant has shown that the plaintiff

-14-

acquiesced in its use of the mark 1) in connection with operating its JRT program and 2) in administering the SCSEP program under the Subgrant Agreement.

### iii. Limitation

National Able's acquiescence defense falters with respect to its use of the marks in connection with providing direct services under the SCSEP program.  The Court concludes that such use exceeds the scope of Operation ABLE's consent.

Prior to the time that plaintiff initiated this lawsuit, National Able did not provide direct services to participants under the SCSEP program in Massachusetts but, rather, provided those services through the Subgrant Agreement with plaintiff.  By expanding into a new market (i.e., offering direct services under the SCSEP program), National Able "redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks."  See Profitness, 314 F.3d at 70 (explaining the doctrine of "progressive encroachment").

Although National Able has apparently provided direct services to the same SCSEP participants under its JRT program, there is no evidence that that program is in direct competition with Operation ABLE.  More importantly, there is no evidence that the defendant's use of the marks in connection with the JRT program ever caused confusion.  See id. at 69 (noting that

-15-

likelihood of confusion is a "critical circumstance" bearing on the scope of plaintiff's consent).  Thus, the fact that plaintiff acquiesced in that use does not preclude it from challenging the defendant's expansion into an area that "more squarely compete[s]" with its services.  See id. at 70.

That National Able has exceeded the scope of plaintiff's acquiescence is best demonstrated by evidence of confusion.  See id. at 68 ("Although a plaintiff cannot simply sleep on his rights, he has no obligation to sue until the likelihood of confusion looms large . . . ." (citation and internal quotation marks omitted)).  As the defendant itself argues, there is no evidence of confusion between the two entities during the five years they operated under the Subgrant Agreement or during the past year in which National Able has rented office space from Operation ABLE.  Since the defendant notified participants that it will begin servicing them directly, however, plaintiff reports 25 instances of actual confusion.  That the likelihood of confusion appears to have substantially increased after the defendant began servicing participants directly under the SCSEP program is persuasive evidence that such use exceeded the scope of Operation ABLE's acquiescence.  See id. at 69.

In sum, it is apparent that as long as competition between National Able and Operation ABLE was minimal, the likelihood of confusion remained low and Operation ABLE was amenable to the

defendant's use of the disputed marks.  National Able's expansion into areas that more directly overlap with the plaintiff's services has, however, created confusion and plaintiff is not precluded from asserting its rights now notwithstanding its prior acquiescence to some uses of the marks.  Accordingly, this Court concludes that the defenses of acquiescence or laches do not foreclose a challenge to defendant's <u>expanded</u> use of the marks.

### c.   Likelihood of Confusion

Likelihood of confusion is assessed considering the so-called <u>Pignons</u> factors: 1) similarity of the marks, 2) similarity of the services, 3) relationship between the parties' channels of trade, 4) relationship between the parties' advertising, 5) classes of prospective purchasers, 6) evidence of actual confusion, 7) defendant's intent in adopting its mark, and 8) strength of plaintiff's mark.  <u>See</u> <u>Pignons S.A. de Mecanique de Precision</u> v. <u>Polaroid Corp.</u>, 657 F.2d 482, 487 (1st Cir. 1981).

### i.   Similarity of the Marks

Similarity of marks can be based on sound, appearance and meaning and "is determined on the basis of the total effect of the designation, rather than a comparison of the individual features."  <u>Volkswagenwerk Aktiengesellschaft</u> v. <u>Wheeler</u>, 814 F.2d 812, 817 (1st Cir. 1987).  Plaintiff asserts that the marks Operation ABLE and ABLE are confusingly similar to National Able Network and Able because both organizations use the word "able"

in a way that is identical in sound and meaning.  Although they
use different logos, the word "able" looks the same when used in
text.

Defendant counters that Operation ABLE and National Able
Network are significantly dissimilar.   With respect to the mark
ABLE alone, it suggests that the meaning of the word "able"
differs because plaintiff uses that word as an acronym for
"Ability Based on Long Experience" while defendant uses it to
suggest skill sets.  The defendant also asserts that the
plaintiff has essentially admitted the marks dissimilarity by
agreeing in the Subgrant Agreement to include both marks in the
same materials.  Finally, it asserts that any similarity has been
diluted by the deliberate use of the marks to distinguish (rather
than confuse) the organizations.

With respect to the mark ABLE in isolation there is little
doubt that its use by both organizations is confusingly similar.
Although the defendant points out that plaintiff's use of ABLE
has a staccato appearance, it is pronounced like the two syllable
word "able."  Furthermore, although the plaintiff sometimes uses
the mark as an acronym, both organizations use the mark to
suggest ability.

With respect to Operation ABLE and National Able Network,
the similarities are less striking.  On the one hand, as the
defendant notes, plaintiff's mark consists of two words and six

syllables while its own mark consists of three words and seven syllables.  Placement of the word "able" also varies in each mark.  Cf. Calamari Fisheries, Inc. v. The Village Catch, 698 F. Supp. 994, 1009 (D. Mass. 1988) (noting that "The Village Catch" and "The Daily Catch" both "begin with the word 'The,' end with the word 'Catch,' . . . contain a two-syllable modifying term in the middle" and "have the same sound and cadence").  On the other hand, the use of words other than "able" within each mark is mostly descriptive, and thus does little to distinguish the entities.  Viewed in their entirety, those marks display moderate similarity.

### ii.  Similarity of Services, Channels of Trade, Advertising and Prospective Customers

The defendant concedes that the parties offer similar services, operate in the same channels of trade, utilize similar advertizing and service the same customers.  It notes, however, that the "customers" that both parties services are virtually unlimited because less than one percent of eligible individuals receive SCSEP funds.  Consequently, there is arguably no "competition" between the parties for participants.  Nevertheless, these factors weigh in favor of finding a likelihood of confusion.

### iii. Actual Confusion

Although plaintiff "need not show actual confusion to

prevail on its claim for service mark infringement," such evidence is "highly persuasive." Calamari Fisheries, 698 F. Supp. at 1011.  Here, plaintiff asserts that since National Able terminated the Subgrant Agreement and informed participants of the change in their services there have been 25 instances of actual confusion.  Defendant responds that plaintiff's evidence of actual confusion is unavailing because it consists of hearsay and vague assertions that "participants have reported being confused," or "I believe that participants . . . were confused." The defendant has also submitted an affidavit from one of its own employees that she is unaware of any confusion over the disputed marks.

Although plaintiff's evidence is less persuasive than it would have been had it included affidavits from the actual participants or employees who found the letter confusing, it is nevertheless entitled to some weight and favors a finding of likelihood of confusion.

### iv.  Defendant's Intent

Although plaintiff asserts that the defendant's conduct is "suspect," it is apparent that the defendant adopted the name National Able Network to avoid confusion and distinguish itself from the plaintiff rather than to engender confusion and trade on plaintiff's goodwill.  Although this factor weighs in the defendant's favor, "a finding of good faith is no answer if

-20-

likelihood of confusion is otherwise established." <u>Star Fin.</u>
<u>Servs., Inc.</u> v. <u>AASTAR Mortgage Corp.</u>, 89 F.3d 5, 11 (1st Cir.
1996) (citation omitted).

### v.   Strength of Plaintiff's Marks

The strength of a mark is determined by

> evidence of the length of time the mark has been used,
> its renown in the plaintiff's field of business, and
> the plaintiff's actions to promote the mark.

<u>Star Fin.</u>, 89 F.3d at 11 (citation omitted).  Its placement on
the spectrum of distinctiveness is also relevant to the inquiry.
<u>See</u> <u>Boston Duck Tours</u>, 531 F.3d at 16-17.

Plaintiff maintains that it has used the marks Operation
ABLE and ABLE continuously for more than 25 years.  Moreover, it
promotes both marks on its website and has been recognized by
those marks in the media.  The defendant responds that the
strength of the marks, if any, lies in the word Operation because
ABLE is an acronym and merely descriptive.

This Court concludes that the mark Operation ABLE is strong.
The mark ABLE in isolation, although used less frequently, has
been used by the plaintiff to identify its organization for many
years and is at least moderately strong.  If any part of
plaintiff's mark is descriptive or generic it is the term
Operation and not ABLE.  Accordingly, the strength of the marks
weighs in plaintiff's favor.

### vi.  Summary of Likelihood of Confusion

In sum, of the eight factors identified in <u>Pignons</u>, only one weighs in the defendant's favor.  Each of the remaining seven supports to one degree or another a finding of likelihood of confusion.  Thus, defendant's use of the marks Able and National Able Network create a likelihood of confusion with plaintiff's marks ABLE and Operation ABLE and plaintiff has shown a likelihood of success on the merits.[4]

### 2.  Irreparable Harm

Plaintiff asserts that this Court must find irreparable harm if it finds a substantial likelihood of success on the merits. See <u>Societe Des Produits Nestle, S.A.</u> v. <u>Casa Hevetia, Inc.</u>, 982 F.2d 633, 640 (1st Cir. 1992) ("[I]rreparable harm flows from an unlawful trademark infringement as a matter of law.").  The defendant responds that the Supreme Court's recent holding in <u>eBay, Inc.</u> v. <u>MercExchange, LLC</u>, 547 U.S. 388, 394 (2006), calls into question the propriety of presuming irreparable harm.  The holding of that case, however, was confined to permanent injunctions issued under the Patent Act, and the First Circuit has made no indication that the presumption is no longer applicable to preliminary injunctions in trademark cases.

---

[4] The Court also concludes that the disclaimer proposed by the defendant is not likely to cure such confusion.  Notably, the letter sent to participants that first created confusion distinguished the two organizations but apparently to no avail.

Accordingly, plaintiff is entitled to a presumption of
irreparable harm.  Moreover, as explained more fully with respect
to defendant's acquiescence and laches arguments, that
presumption is not rebutted by the plaintiff's delay in filing
suit.

### 3.    Balance of the Hardships

If an injunction were to enter the defendant would have to
establish a new brand and abandon the name and marks (including
registered marks) it has been using for five years at
considerable expense.  Absent an injunction, however, consumer
confusion will likely erode the goodwill that plaintiff has
developed over a period of 25 years.  This Court therefore
concludes that the balance of hardships favors the plaintiff.

### 4.    Public Interest

The risk of consumer confusion ordinarily favors entering an
injunction when trademarks are found confusingly similar.
Defendant, however, advances a novel argument that the public
interest would not be served by an injunction in this case
because the "consumers" that Operation ABLE and National Able
serve are so numerous that there is no real competition.  In
fact, there are more people in need of services than both
organizations can serve.  The defendant argues that an injunction
would prevent it from operating in Massachusetts under its trade
names and thereby deprive valuable services of those in need.

An injunction, however, would not preclude National Able from operating in Massachusetts but rather only preclude it from using marks confusingly similar to those used by Operation ABLE. Accordingly, the interest in avoiding confusion among participants, potential donors and the public favors an injunction notwithstanding the lack of competition for participants.

### ORDER

In accordance with the foregoing, plaintiff's motion for preliminary injunction (Docket No. 3) is **ALLOWED**, in part, and **DENIED**, in part, as specifically set forth in the accompanying injunction.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated August 3, 2009